### No. 6606.

EMPIRE PARISH PACKET COMPANY vs. UNION INSURANCE COMPANY.

.Breach by the insured of the warranties stipulated in a policy of marine insurance : the insurer discharged by reason thereof.

APPEAL from the Fifth District Court, parish of Orleans. *Rogers, J.*

E. Howard McCaleb, J. S. Whitaker and W. S. Benedict for Plaintiffs and Appellants.

Kennedy & Chiapella for Defendant and Appellee.

The opinion of the Court was delivered by

Poché, J.   Plaintiffs sue the defendants for $5340 under a policy of insurance issued by defendants on a steamboat named the "Empire," owned by plaintiffs, which boat was sunk at her moorings, in the port of New Orleans, on November 17th, 1874, and proved a total loss.

Defendants admit the execution of the policy, and the loss of the steamer, but resist payment on the following grounds of defense :

First.   The captain was incompetent by reason of habits of intemperance.

Second.   That there was only one watchman, who was incompetent.

Third.   That the steamboat was overloaded, and sank in calm weather.

Fourth.   The boat did not have proper machinery.

Fifth.   That the boat was improperly managed in this port, her cargo not being properly stowed.

The judge of the District Court rendered judgment in favor of defendants rejecting plaintiffs' demand, and they have appealed.

The policy was executed on the 3d of October, 1874, and contains the usual clauses and stipulations.   Among other warranties assumed by the assured, we find the following :

"That the steamer shall be navigated in strict compliance with the provisions of any and all acts of Congress regulating or pertaining to the navigation or management of vessels propelled, in whole or in part, by steam."

"And free from any loss or damage occasioned"   *   *   *   "by the negligence or misconduct of those in charge of the steamboat at or before the time of any accident or disaster."

The judge of the lower court, after reviewing the evidence in a very able and impartial manner, concluded that plaintiffs had violated both stipulations contained in this warranty, and discharged the insurer. After a careful review of the evidence and of the briefs of counsel, we reach the same conclusion.

The record, in our opinion, establishes the following facts :

The steamer Empire, on a trip from the parish of Plaquemine, reached the city on the 17th of November, 1874, at twenty minutes past twelve o'clock in the night, with a full list of passengers, and a very heavy and unusual load or cargo of sugar, molasses and rice.

While her registered tonage was 203 60-100 tons, she carried on that trip 228 tons, which, in our opinion, was an overload ; this fact was noticed by some of her passengers, several of whom had, in consequence of such an injudicious load, and alarmed at the sight of the water, which swept over the steamer's guards, spoken of leaving the boat be-

fore she reached the city. But being assured by the captain and other officers that the steamer was safe, they continued their journey on the boat. Notwithstanding rain and wind, and the lateness of the hour, several passengers, impelled by the danger which they foresaw, refused to sleep on board, and, fortunately, left for their homes. One of them, who had on board his wife, four children and two servants, failing at first to find the necessary means of transportation, had allowed his family to retire, but considering that there was danger, he had concluded to sit up and keep watch, when a passing cab-man, thrown in his way by the hand of Providence, was engaged at once, and with his family the passenger left the ill-fated steamer, notwithstanding the assurances of safety given by the captain, and his solicitations to induce him to remain. While danger was thus apparent, even to a passenger without experience in navigation, we see this captain allow his engineers to retire, tolerate his clerk in hastily leaving the boat before her stages were launched, and allow all hands to either leave the boat or retire to bed, destined to watery graves, save and except a sleepy watchman, who takes his seat on the upper deck, when the danger was below, and who admits to have visited the hold but once from the time of the landing up to the moment of the disaster.

Under the circumstances, it would be difficult to conceive of a case of more absolute negligence or mismanagement on the part of an officer in charge of a steamboat. The attempt to show compliance with the law of Congress, requiring all steamers of one thousand tons and under to have constantly two watchmen on duty, by proving the performances of that duty by a cabin boy or waiter, is too flimsy to require serious consideration or refutation at our hands. The conduct of the captain and owners, in this particular, is a direct and unjustifiable violation of the first stipulation in the warranty above quoted.

The omission of the captain in not keeping up fires ready to work the pumps in case of emergency, in allowing the boat, whose freight was badly stowed, causing a listing of the boat to one side, without discharging part of the cargo, trimming the boat, and exposing her to take in water, as it did happen, and retiring to bed under a sense of false security, are acts which satisfy us of his incompetency or misconduct, and therefore violate the second stipulation of the above warranty.

It is a well-settled principle of jurisprudence that a breach of warranty in a policy of insurance, by the assured, as shown by the record, discharges the insurer. 6 N. S. 51, and authorities there quoted.

In order to rebut the presumption of unseaworthiness of their steamer, raised by the fact of her rapid sinking and total loss without apparent cause, plaintiffs rely upon abstract theories to show possible causes of the disaster. But the evidence does not support or bear out

their theories. Even if sustained, their theory would, at most, show that a well-built, staunch steamer, of only two years' service, recently caulked and otherwise repaired, well provided with all necessary machinery and other appliances, not overloaded, well trimmed, commanded by competent and experienced officers, reaches the port, is thoroughly examined by her officers, who find nothing suspicious about her, see that she is well fastened to shore, and have her watched by competent watchmen, and that by the single action of the waves or swells caused by the wind and by passing steamers, her riggers are torn or separated from her hull, she suddenly fills with water and sinks out of sight in a few minutes. This theory is flatly contradicted by the evidence.

On the other hand, defendants contend that the boat was overloaded, her cargo badly trimmed, that, contrary to law, reason and custom, the boat is landed and left in such condition, without any effort to relieve her, her engineers leave or retire to rest, her fires are allowed to go down, an only watchman is placed on duty to protect the lives and the property on board, and he sits up on the upper deck, visits the hold but once, and the hatches are left open ; and thus the disaster becomes inevitable. This theory is more rational, it is supported by the evidence, and entitles the insurer to his discharge.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be affirmed with costs.